## The State vs. Mills and others.

*April 14 — May 10, 1882.*

TREASURER OF STATE HOSPITAL FOR THE INSANE. *Whether and when there was a breach of his bond. Liability of sureties.*

1. The determination in *State v. Bœtz*, 44 Wis., 624, that the former state treasurer was not liable to the state for the amount of the check in favor of M. as treasurer of the state hospital for the insane, which he delivered to M. on the 22d of September, 1873, and that M. became liable for the amount as such treasurer upon receipt thereof, adhered to.

2. M. deposited the check to his individual credit in said bank a few days before it was adjudged a bankrupt, taking from the bank collaterals from which he made the amount, but he failed to credit the state with the sum; and in the summer of 1875 he used the same, or a like amount from other appropriations to said state hospital, in paying a judgment rendered against him in the federal bankrupt court by the assignee in bankruptcy of said bank. *Held,* that this was a misappropriation of said sum, for which M. and the sureties on his official bond, then in force, became liable.

3. The trustees of the state hospital for the insane have no authority to contract debts in excess of the moneys actually appropriated to the institution from time to time, by the legislature.

4. Between November 1, 1875, and February 20, 1876, M. had not sufficient funds of the hospital in his hands (excluding said $10,000) to pay all the orders drawn on him for current expenses of the institution; and funds were raised by procuring to be discounted notes declaring that the trustees of said hospital would pay to the order of A. (the president of the board of trustees) a certain sum — which notes were signed by A., and indorsed by him and by M. in their private capacity. The proceeds of these notes were charged to M. as treasurer, and used in paying orders upon him as such, to the amount of $18,000. In March, 1876, the legislature appropriated $18,400 to said hospital "for replacing an overdraft of the current expense fund" of the previous year; and M., as such treasurer, drew this amount and applied it in payment of said notes. The same legislature directed the attorney general to commence suit against the party who was legally liable, in his opinion, for the $10,000 represented by said check of September 22, 1873. *Held:*

(1) That the proceeds of the notes above described became the individual funds of M. — A. occupying the position of accommodation indorser.

(2) That the payment by M., with his said funds, of orders upon him as treasurer to the amount of the $10,000 due from him to the hospital treasury, cured the breach of his bond which occurred in the summer of 1875.

(3) That the utmost effect of the act of 1876 above recited was to prevent the payment of said notes by M., out of the appropriation then made, from operating as a breach of M.'s official bond then in force given in October, 1875.

(4) That (if there was no breach of the bond of 1875) M.'s failure, in 1877, to pay over to his successor in office the $10,000 represented by the treasurer's check of September 22, 1873, was a breach of his last official bond, executed by the same parties, in October, 1876.

5. In this action, based upon both of the bonds executed by the defendants (in October, 1875, and October, 1876), judgment was properly rendered against all the defendants for the amount of the said $10,000 (less a small credit due M.), with interest from the commencement of the term of M.'s successor in office.

APPEAL from the Circuit Court for *Dane* County.

For several years preceding November 1, 1877, and up to that time, the defendant *Mills* was continuously treasurer of the Wisconsin state hospital for the insane, under successive appointments, and from time to time gave bonds to the state, conditioned for the faithful performance of the duties of such office. This action is brought upon two of said bonds, each executed by the defendant *Mills* as principal, and by the defendants *Dunning* and *Young*, and also by Nathaniel W. Dean, since deceased, as sureties. One of said bonds is dated October 30, 1875, and is for the penal sum of $50,000; the other is dated October 28, 1876, and is for the penal sum of $20,000. The substance of the condition of each bond is, that the defendant *Mills* shall faithfully perform all the duties of his said office, and shall safely keep, disburse and account for all moneys that shall come into his hands as such treasurer. The breach of said bonds assigned for cause of action is the failure of the defendant *Mills* to pay over to his successor in office the sum of $10,000, part and parcel of the moneys theretofore received by him from the state as such treasurer for the uses of the hospital. This alleged breach of the bond arises out of the same transactions which were the grounds of the action of *State v. Bœtz*, 44 Wis., 624. That was an action to recover from a former state treasurer the same $10,000 which is claimed in this action. The state treasurer was held not liable therefor. The evidence in that case, so far as it goes, was substantially repeated in this action. This case was referred to Hon. S. U. Pinney as sole referee, to hear, try and determine the same. It was tried before him, and in due time he filed in the circuit court his report of the testimony, with his findings of fact and conclusions of law therefrom. He found that the plaintiff is entitled to recover the amount claimed, less a small sum on account of a trifling error in some computation. It is deemed essential to a full understanding of the case to insert here the report of the referee, although it is quite volumi-

nous.   The case of *State v. Bœtz, supra*, should also be read in connection therewith.   The referee's report is as follows:

"After hearing the evidence and arguments of counsel, I find the following facts proved at the trial:

"*First.* On the 7th day of April, 1875, the defendant *Mills* was duly appointed trustee of the Wisconsin state hospital for the insane, and duly qualified as such trustee, and entered upon the performance of the duties of such office, during all the time he continued thereafter to hold the office of treasurer of said hospital as hereinafter stated.   On the third Wednesday, being the 20th day of October, 1875, said defendant *Mills* was appointed by said board of trustees treasurer of the said hospital for the term of one year thereafter, and until his successor should be chosen and qualified. On October 30, 1875, he, with the defendants *Philo Dunning* and *Peter Young*, and Nathaniel W. Dean, then in his lifetime, as sureties, executed and delivered and deposited with the secretary of state his bond for the faithful performance of his duties as treasurer, in the sum of $50,000, as prescribed by said board of trustees, and which was approved by the governor, a copy whereof is made Exhibit A to the plaintiff's amended complaint.   Immediately prior to that date the defendant *Mills* had held said office of treasurer of the Wisconsin state hospital for the insane for the period of about fourteen years, continuously; and he was so chosen and so qualified as aforesaid as his own successor in said office.   At the annual meeting of the board of trustees of said hospital, held on the third Wednesday, being the 18th of October, 1876, said defendant *Mills* was duly chosen treasurer of said hospital as his own successor in said office for the term of one year next thereafter, and until his successor should be duly chosen and qualified.   On October 28, 1876, said defendant *Mills*, with the defendants *Philo Dunning* and *Peter Young*, and Nathaniel W. Dean, then in his life-time, as sureties, executed his bond for the faithful performance of

his duties as treasurer in the sum of $20,000, as prescribed by said board of trustees, and which was approved by the governor, and delivered and deposited with the secretary of state on November 21, 1876, a copy whereof is made Exhibit B to the plaintiff's amended complaint. And the defendant *Mills* continued to hold said office of treasurer and perform the duties thereof, under said elections and said bonds, from the said October 30, 1875, until November 1, 1877, when he was succeeded therein by Andrew Proudfit, who had been duly chosen and qualified as his successor.

"*Second.* The defendant *Mills* has duly paid out and disbursed all the moneys received by him as treasurer of said hospital, except the sum of $15,565.63, which he paid over to his said successor in said office, unless he and his sureties are chargeable in this action upon the obligations sued on, or either of them, for the sum of $10,000, represented by what is called the Bætz check, drawn on the Bank of Madison by Henry Bætz, late state treasurer, on September 22, 1873, for $10,000, which the defendant *Mills* took of said state treasurer on account of the installment which would become payable to him as treasurer of said hospital on the 1st of October following. Within two or three days after the date of said check, the president of said bank, pursuant to an agreement between him and said *Mills*, delivered to the latter collaterals belonging to the bank, of the value of about $13,000, to secure to the said *Mills* the amount mentioned in said check of the state treasurer, and for leaving that amount with the bank; said *Mills* having received the check, and another for $3,000, drawn by said Bætz on a Milwaukee bank, and given his receipt to the state treasurer for $13,000. *Mr. Mills* collected both of these checks — the one for $3,000, of the Milwaukee bank, and the one for $10,000 out of the collaterals so received by him of the bank. On October 3, 1873, said *Mills* procured from the office of secretary of state an instrument in the form of a warrant for the payment of

the October installment of the hospital appropriation of $13,487.75, having indorsed thereon the name of John S. Dean, who was then assistant secretary of state, but not signed by the secretary, and took it to the state treasurer, who there, upon paid said *Mills* the balance of the installment, $487.75 in money, and the former receipt was surrendered, and *Mr. Mills* gave the state treasurer the following receipt, indorsed upon the warrant, for the whole installment: 'State Treasurer's Office. Received, Madison, October 3, 1873, from the state treasurer, payment in full of this certificate. SIMEON MILLS, Treasurer.' On September 27, 1873, the Bank of Madison suspended payment, and before the execution of said last named receipt ceased to pay its obligations; and on the day following the date of said receipt it was adjudicated bankrupt by the district court of the United States for the western district of Wisconsin, and one Willett S. Main having been appointed assignee of its estate and effects, in the latter part of October, 1873, he brought an action in the said district court against said *Mills* to recover the collaterals so received by him from the bank, or the proceeds thereof, claiming that they had been received by said *Mills* in violation of the bankrupt law, and that his receipt of them for the security of said check was an illegal and fraudulent preference. This action resulted in a judgment in that court against *Mr. Mills* for the value of the said collaterals, about $10,600, and, except as he received the proceeds of such collaterals, he obtained nothing on the said check. The amount of the check was charged to Mr. Bœtz on the books of the bank, when it was received by *Mr. Mills*, as aforesaid, and credited to the latter, and the whole amount of the October installment of the hospital appropriation, $13,486.75, was placed to the credit of the state treasurer in the books of the secretary of state, under date of October 1, 1873. The judgment so recovered against said *Mills* in said district court for said collaterals was paid by him in July, 1875. Demand for said

$10,000 was made upon *Mr. Mills* by his successor in office before the commencement of this action, but it was not complied with.

" *Third.* I find that the defendant *Mills* had on hand in fact, as treasurer of the said hospital, on October 1, 1875, the sum of only $8,209.22; that this was the entire amount of all moneys he then had, public and private; that if, as between him and the state, he is chargeable with the moneys collected out of the collaterals given by the bank to secure the check of Henry Bætz, state treasurer, he should have had on hand at that time, and was chargeable as such treasurer with, the sum of $18,209.22; that after October 1, 1875, and up to the expiration of his office, November 1, 1877, as treasurer, the defendant *Mills* received, as such treasurer, moneys and funds of the state to the amount of $261,680.80, which, with the amount actually on hand October 1, 1875, makes the sum of $269,883.02; that between October 1, 1875, and November 1, 1877, the defendant *Mills*, as such treasurer, paid out upon orders $254,318.66, and paid over to his successor in office, Andrew Proudfit, at the end of his term, November 1, 1877, $15,565.33, making the total amount so paid out and paid over, after October 1, 1875, the sum of $269,884.10, being $1.08 in excess of the amount he had on hand October 1, 1875, and the money thereafter received by him; and that the actual balance in his hands as such treasurer, October 24, 1875, was $11,239.06.

" *Fourth.* The defendant *Mills*, during the period of all these transactions, kept but one account at bank for public, private and trust funds which he received from various sources, and, as he expresses it, 'put it all in one pot,' and ' drew out just as he had occasion to use it.' It is not stated in evidence whether this account was kept in his individual or his official capacity as treasurer, or with any trust designation; and I think the fair inference from all the evidence is that it was kept in his individual name, as private accounts

are kept. After getting the collaterals from the Bank of Madison he presently proceeded to collect the same, and during the month of October, 1873, actually collected from them over $10,000, which he placed to the credit of his said bank account. About this time, November 1, 1873, and while he was such treasurer, he commenced buying hospital orders drawn by the secretary on him on account of audited bills against the Wisconsin state hospital for the insane, and presently purchased such orders to the amount of $10,000, paying for them with checks against his said bank account. These orders he kept in an envelope as a private investment, as claimed by him, and did not charge them up in his account as treasurer against the funds he had received as such until some time in July, 1875, and claims to have bought them with his own private funds. After said judgment had been recovered against him in the district court for the moneys collected on said collaterals, in favor of the assignee of the Bank of Madison, and after the same had been affirmed, and in June or July, 1875, he charged up said $10,000 of orders as cash paid out, as against the sums received by him, taking to his own use thereby a corresponding amount of the hospital funds in his hands as such treasurer, and thereupon afterwards, in the fall of 1875 and the winter of 1875 and 1876, the hospital became in arrears and in want of funds to meet current expenses and pay orders, etc. Until he so charged up said orders, he claimed to carry the same for the benefit of the hospital, so that no inconvenience should be experienced on account of an alleged want of funds by reason of the complications in reference to the said check of the state treasurer. The defendant *Mills*, in his reports as treasurer, did not charge himself with the said check or with the moneys received out of the said collaterals, but the secretary did charge him therewith in the sum of $10,000 in his reports, whereby a discrepancy existed between their respective reports to that amount. In November and December,

1875, and January and February, 1876, the moneys actually in
the hands of the treasurer of the hospital proved insufficient
to pay current expenses or orders drawn on him, and funds for
that purpose were procured by the treasurer in the follow-
ing manner, to wit: Notes were drawn up, in substance that
the trustees of the Wisconsin state hospital for the insane
would pay to the order of D. Atwood the sums respectively
stated therein, and were signed by the said D. Atwood, as
president of the board of trustees, and were indorsed by him
in his personal capacity, and afterwards by the defendant
*Mills* in like manner. These notes were prepared or procured
to be signed and indorsed as aforesaid by *Mr. Mills*, who
took them from time to time as needed to the bank and got
them discounted, and the proceeds thereof were carried to
the account of said *Mills*, and used in paying up orders.
Between November 1, 1875, and February 20, 1876, notes of
such character and indorsed as aforesaid, to the amount of
about $20,000, were so discounted, and the proceeds carried
to the account of *Mr. Mills* at the bank. The said D. At-
wood and the defendant *Mills* constituted the executive com-
mittee of the board of trustees; and it was stated by *Mr.
Mills*, in his testimony, that there was a resolution of the
board authorizing the executive committee to borrow money,
but the resolution was not produced. Mr. Atwood signed
and indorsed the notes as aforesaid on *Mr. Mills'* promise to
take care of them when the legislature appropriated money
for the hospital. Loans had been made on several previous
occasions in like manner to meet the necessities of the insti-
tution. No written reports or entries in relation to said loans
were made, or appear on the books of the institution or of
its officers, the transactions not appearing on any of their
books; but verbal explanations were made occasionally as to
such transactions of borrowing money as interest accounts
were presented. On the 11th day of March, 1876, the legis-
lature, by act published March 15, 1876 (chapter 279, Laws

of 1876), appropriated to the Wisconsin state hospital for the insane, 'for replacing an overdraft of the current expense fund of last year, $18,454,' which the defendant *Mills*, as such treasurer, drew on the 16th day of the same month, and applied to the payment of notes of about that amount given and indorsed and discounted in November and December, 1875, and January and February, 1876, as aforesaid, remaining unpaid, and the proceeds of which had been carried to his account, and the greater portion of which, and more than $10,000 thereof, had been paid out by him in payment of orders drawn on him as such treasurer. At this date the defendant *Mills* drew in all from the state treasury $32,728.30, and the secretary of the hospital only charged him with having received at that time $22,728.30, by which means the discrepancy between their accounts hereinbefore noticed ceased to exist.

"*Fifth.* If, in adjusting the account of *Mr. Mills* as treasurer, the rule in *Clayton's Case*, 1 Mer., 608, is adopted, and the items of payment made by him are to be applied in their order to the extinguishment of the sums he has received, and in the order in which he received them, it will then appear that this deficiency of $10,000 accrued and is chargeable to the period of time covered by the two bonds in suit. I have been asked by the plaintiff's counsel to find that the bond of *Mr. Mills* for his term as treasurer for the year preceding the third Wednesday of October, 1875, was signed by the same sureties as the bonds in suit; but as the bond itself, when offered in evidence, and which is the best evidence of that fact, was excluded upon the ground that the plaintiff had not counted on the same in its complaint, but predicated its claim upon two other special obligations, I decline to find as requested.

"As conclusions of law I find the following, to wit:

"(1) That the transaction between the state treasurer and the defendant *Mills* and the bank amounted to a payment

by the state treasurer to *Mr. Mills*, as treasurer of the Wisconsin state hospital for the insane, of the $10,000 represented by the check which *Mr. Mills* elected to receive as payment, and the amount of which he collected out of the collaterals given him by the bank to secure the payment of the check, upon his suffering the amount to remain with the bank, and that he became chargeable therewith as treasurer of the Wisconsin state hospital for the insane.

"(2) That when *Mr. Mills* bought up orders drawn on him as such treasurer upon audited accounts against the hospital with funds drawn from his said bank account, or collected from said collaterals, he, in legal effect, paid such orders, as it was his duty to have done as such treasurer, and that he could not keep such claims alive as a so-called private investment by omitting to enter them upon his account as treasurer as paid, and claim to hold them in his private capacity as a creditor of the state or of the said hospital.

"(3) That his act in taking from the funds in his hands as such treasurer, to his private use, $10,000, when he paid the judgment against himself in the United States court, and when he entered up and took credit for the sum of $10,000 of such orders so purchased up and claimed to be held by him in his private capacity, was a misappropriation of that amount then occurring, and for which he and those who were then his sureties became at once liable to the state.

"(4) That the ruling in the *Clayton Case*, relied on by the plaintiff's counsel, cannot be applied to this case consistently with the principle of the decision in *Vivian v. Otis*, 24 Wis., 518, and that it is not a material circumstance whether the sureties on the bond in force when the said misappropriation took place in July, 1875, are identical with those on the bond in suit.

"(5) That the transactions in November and December, 1875, and January and February, 1876, by which money was borrowed, to the amount before stated, upon a note or notes

signed by the president of the board of trustees, payable to the order of such president in his private capacity, and indorsed by him, and afterwards by *Mr. Mills*, in their private capacities, by which they became severally liable thereon, and the proceeds of such notes put to the credit of *Mr. Mills* at the bank, did not bind the state or the Wisconsin state hospital for the insane, which is a *quasi* corporation and a mere state agency in caring for the insane; nor was Mr. Atwood bound thereby as maker thereof; that it and its officers have and had no power to borrow money, and that the title to the fund thus raised vested in *Mr. Mills* when carried to his account at the bank, and if the bank had been garnished on account of such deposit as the debtor of *Mr. Mills*, it could not be maintained that the deposit belonged either to the state or to the Wisconsin state hospital for the insane; that *Mr. Mills'* payment out of the same of hospital orders drawn on him as such treasurer from time to time, to an amount exceeding $10,000, prior to March 16, 1876, amounted, as between him and the state, to a payment by him to the use of the state of the sum of $10,000 so previously misappropriated, and which it was his duty to pay, and, as to any excess so paid over the $10,000, made him the equitable owner of all claims paid out of such borrowed fund, and entitled to reimbursement from the hospital fund for such advance.

"(6) That the use of the appropriation of 1876 to pay off said note or notes upon which money had been so borrowed as aforesaid to the extent of said $10,000 so previously misappropriated and repaid, was a misappropriation of that amount of said appropriation of 1876, occurring March 16, 1876, for which *Mr. Mills* and his co-defendants, as his sureties in the bond dated October 25, 1875, became and are liable.

"(7) That inasmuch as the defendant *Mills* was re-elected and qualified again in November, 1876, and continued to dis-

charge the duties of treasurer until November 1, 1877, and as there is no proof of any failure on his part to promptly pay all orders drawn on him after March 16, 1876, or that he has made any special gain from the said $10,000, he and his sureties should be charged with interest only from the time he failed to pay over the amount of $10,000, less $1.08 hereinbefore mentioned, being the sum of $9,998.92, to his successor in office, November 1, 1877.

"(8) That such a failure constituted a breach of the bond marked Exhibit A, annexed to the said amended complaint, for which the plaintiff is entitled to judgment against the defendants for the said sum of $9,998.92, with interest from November 1, 1877, amounting in all to the sum of $12,405.80, with the costs and disbursements of this action.

"All of which is respectfully submitted.

"S. U. PINNEY, Referee."

Exhibits A and B mentioned in the foregoing report, are the bonds in suit.

The circuit court confirmed the report of the referee in every particular, and gave judgment for the state in accordance therewith. The defendants appealed from the judgment.

For the appellants there was a brief by *F. J. Lamb*, and oral argument by *Mr. Lamb* and *P. L. Spooner*.

For the respondent there was a brief by the *Attorney General*, and oral argument by *H. W. Chynoweth*, Assistant Attorney General.

LYON, J. In *State v. Bœtz*, 44 Wis., 624, the question was, whether the treasurer was liable for the $10,000 sought to be recovered in this action. For reasons which then were and still are entirely satisfactory to us, it was held that he was not liable therefor. It seems to follow from that decision that the defendant *Mills* is liable for such deficiency; for it cannot well be controverted that one of them is so liable.

Such is the result of the opinion in that case. *Mr. Mills* was not a party to the suit against Bætz, and the propositions there ruled are not as to him *res adjudicata.* He may still be heard to dispute his liability for the deficiency claimed. In the arguments on this appeal the question of his individual liability therefor was not discussed by his counsel, but the whole defense to the action is rested upon the proposition that the alleged default occurred before either of the bonds in suit was executed, and hence that there can be no recovery of the deficiency in this action, which is solely upon the bonds. Perceiving no valid reason for changing our opinion as to the liability of *Mr. Mills*, expressed in the suit against Bætz, we must hold, as at present advised, that *Mr. Mills* is individually liable to the state for the money claimed in this action.

The principal question is, therefore, was the failure of *Mr. Mills* to pay over the $10,000 to his successor in office a breach of the condition of either of the bonds in suit? The learned referee determined that *Mr. Mills* broke the condition of his official bond then in force, and rendered himself and his sureties in such bond liable to the state for the amount of the Bætz check, when he charged the state with the amount of hospital orders he had paid or purchased with the proceeds of that check, without giving the state credit for such proceeds. This was in June or July, 1875. About the same time he paid the judgment recovered against him by the assignee in bankruptcy of the Bank of Madison, for the proceeds of the collaterals he had received from the bank as security for the payment of the check. These transactions, when simplified, disregarding dates, amount to this: *Mr. Mills* received $10,000 from the state through the Bætz check and such collaterals, and paid out the same for the purposes to which the legislature had appropriated the money; that is, to the payment of hospital orders regularly drawn upon him for the current expenses of the institution. He

charged the amount so paid to the state. Thus far all was regular. But he failed to give the state credit for the $10,000, and used it (or a like amount out of other hospital appropriations) to pay the judgment recovered against him by the assignee in bankruptcy. The state never having undertaken to indemnify *Mr. Mills* against the risk of being required to pay over the proceeds realized from such collaterals for the benefit of the creditors of the Bank of Madison, this was a clear misappropriation of that amount of the money of the state in his hands, and a breach of the condition of his official bond then in force.

We think the determination of the referee on this branch of the case is in harmony with the doctrine of *Vivian v. Otis*, 24 Wis., 518, and that it must be held that the first breach of any official bond of *Mr. Mills* in respect to the proceeds of the Bætz check occurred in the summer of 1875, and before either of the bonds in suit was executed. For such breach, therefore, there can be no recovery in this action, because that bond is not counted upon.

This brings us to consider the grounds upon which the referee and the circuit court held the defendants liable for the $10,000 on the bond of October 30, 1875, which is counted upon in the complaint. The referee found, and his finding seems to be supported by the proofs, that in the months of November and December, 1875, and January and February, 1876, *Mr. Mills* had not sufficient funds of the hospital in his hands (excluding the $10,000 in controversy) to pay all of the orders drawn upon him for the current expenses of the institution; and that funds were obtained by him for that purpose by borrowing money of some bank by means of certain notes described in the fourth finding of fact. These notes amounted to about $20,000. The proceeds, or, at least, more than $10,000 of the proceeds, of such notes were applied by *Mr. Mills* during those months to the payment of hospital orders regularly drawn upon him.

The referee held that the money realized by *Mr. Mills* on these notes was, under the circumstances of the case, his individual money, and that by applying it in payment of orders to an amount exceeding $10,000 he had made good the deficiency of June or July, 1875.   As matter of fact the bill of exceptions shows that on January 10, 1876, *Mr. Mills* had taken up hospital orders to an amount exceeding $8,000 over and above all moneys he had then received from the state as hospital treasurer, including the $10,000 represented by the Bætz check.   Mr. Mills paid these notes with money drawn by him in March, 1876, from the state treasury for the use of the hospital.   This the referee held was a misappropriation of the fund held by him as treasurer, and a breach of his official bond of October 30, 1875, to the extent of $10,000; that being the sum so received by him which he failed to pay over to his successor in office.   If the money realized by him on the notes was his individual money, we see no escape from the conclusion that, by applying it to pay hospital orders drawn upon him, to the amount of $10,000, he thereby repaired the breach of the bond in force in June and July, 1875.   Had an action been brought on such bond after he had paid those orders with his own funds, there can, we think, be no doubt that evidence that he had done so would be a complete defense to that action.   Hence it becomes important to determine whether the proceeds of the notes which *Mr. Mills* procured the bank to discount belonged to him individually.

The referee found the notes above mentioned were in substance and to the effect " that the trustees of the Wisconsin state hospital for the insane would pay to the order of D. Atwood the sums respectively stated therein, and were signed by the said D. Atwood, as president of the board of trustees, and were indorsed by him in his personal capacity, and afterwards by the defendant *Mills* in like manner.   These notes were prepared and procured to be signed as aforesaid

by *Mr. Mills*, who took them from time to time, as needed, to the bank and got them discounted, and the proceeds thereof were carried to the account of said Mills and used in paying up orders." The referee also finds that the bank account of Mr. Mills in which the proceeds of the notes were credited "was kept in his individual name, as private accounts are kept." We think the testimony fairly supports the above findings.

It cannot be said too emphatically, or repeated too often, that the various boards of trustees and managers of the benevolent and penal institutions of the state have no power to contract debts beyond the appropriations made by the legislature for the support and operation of their respective institutions. A debt against one of these institutions is a debt against the state; and if such boards could contract debts *ad libitum*, the constitutional limitation of state indebtedness to $100,000 (article VIII, sec. 6) might become utterly inoperative. See *Sloan v. State*, 51 Wis., 623.

The notes, purporting to have been given by the hospital trustees for the purpose of raising money beyond the amount theretofore appropriated by the legislature to the hospital, were entirely unauthorized, and bound neither the hospital nor the state. There was no existing legislative appropriation undrawn with which they could be paid, but their only foundation was the hope or expectation that an appropriation would be thereafter made to cover them. They bound nobody but Mr. Atwood and *Mr. Mills*, who indorsed them in their individual capacities. The facts that the board of trustees authorized the giving of the notes, and had repeatedly authorized similar notes to be given during the preceding ten years, and that it allowed *Mr. Mills* to charge the discount on the notes in his account with the hospital, are of no significance. Neither the hospital nor the state could have reached the proceeds of the notes by judicial process while such proceeds remained on deposit in the bank, or controlled the disposition thereof. The money had stamped upon it no trust obligation

in favor of the hospital or the state. It was, to all intents and purposes, the private property of *Mr. Mills* or Mr. Atwood, or both, and subject absolutely to his or their control and disposal.

This brings us to the questions of the relations of these two gentlemen, as between each other, to the proceeds of the notes, and the legal consequences resulting therefrom. Although the notes were made payable to Mr. Atwood, yet, in view of all the circumstances of their execution and negotiation, we think he was no more or less than an accommodation indorser of them. He made the indorsement, however, under an agreement with *Mr. Mills* that the latter should apply the proceeds to the payment of hospital orders, and that he should pay the notes out of some future legislative appropriation. That agreement was fully executed by *Mr. Mills*, and from thenceforth Mr. Atwood had no further interest in the matter. *Mr. Mills* admits that on October 4, 1875, he had in his hands of hospital funds something over $24,000. In addition to that sum he also had, as is now determined, the $10,000 represented by the Bætz check. It was his duty, therefore, to pay hospital orders to the full amount of $34,000. He did so before he received any other money from the state. But to enable him to do so Mr. Atwood indorsed the notes and entrusted them and the proceeds thereof to him. Mr. Atwood thus became, as it seems to us, substantially and in legal effect an accommodation indorser for *Mr. Mills*, and the proceeds of the notes became the money of the latter. Possibly the money was subject to the trust that it should be applied and the notes paid in a particular manner; but, if so, the trust was executed.

If the foregoing views are correct, it results that *Mr. Mills* paid $10,000 of hospital orders with his own money, in the winter of 1875–6, and that by doing so he healed the breach of the condition of his former bond, which occurred in the summer of 1875.

The question remains, whether the use by *Mr. Mills* of

the money appropriated by the act of January, 1876 (ch. 279, Laws of 1876), to pay the notes, was a breach of the conditions of his bond then in force, as found by the referee. That act appropriates to the Wisconsin hospital for the insane $18,454, "for replacing an overdraft of the current expense fund of last year." *Mr. Mills* drew the appropriation March 16, 1876, and applied the money to the payment of the above-mentioned notes. The legislature of 1876 also adopted joint resolution No. 3, instructing the attorney general to commence suit against the party who, in his opinion, was legally liable for the $10,000 represented by the Bætz check. Laws of 1876, p. 978. The action against Bætz and this action were brought in obedience to that resolution. Ch. 279, Laws of 1876 was enacted after *Mr. Mills* had taken up with his own funds a sufficient amount of hospital orders to make good the $10,000 deficiency of June or July, 1875, and thus had relieved the sureties in his bond then in force from liability therefor. Hence the rights of all parties were fixed before the act was passed, and it was not competent for the legislature to enact a restoration of the liability of sureties thus relieved. Very clearly the legislature did not intend or attempt to do so.

The appropriation was to replace overdrafts. But we think the orders so paid by *Mr. Mills* with his own funds, to the amount of $10,000, were not overdrafts in any correct sense of that term. *Mr. Mills* had received money from the state with which to pay the orders. He used the money to pay the judgment recovered against him by the assignee in bankruptcy of the Bank of Madison. He then paid a corresponding amount of hospital orders with his own funds. That would seem to close the transaction. It is difficult to understand how these orders, or the notes upon which the money was raised with which to pay them, can properly be denominated overdrafts. But, conceding all that can be claimed for the act of 1876, suppose that act had recited that if *Mr.*

*Mills* was liable for the $10,000 he made default in respect thereto in June or July, 1875; that he had raised the money on the notes above mentioned, and with it had paid orders amounting to more than $10,000, and that such notes were still outstanding, and then had appropriated the money specifically to pay the notes,—what would be the effect of the act?

We have seen that it could not operate to restore the old breach of his former bond, which occurred in the summer of 1875, but which had been healed as before stated. Certainly it could not operate to release *Mr. Mills* from liability ultimately to account to the state for the deficiency; for the joint resolution directing suit to be brought to recover it negatives that hypothesis. The utmost effect that could be given to such an act, in our opinion, is, that it would prevent the payment of the notes out of the appropriation from operating as a breach of the bond of October 30, 1875. But this would only postpone the breach to the time when *Mr. Mills* failed and refused to pay over the $10,000 to his successor in office on November 1, 1877. In other words, it would make the defendants liable on the bond of 1876, instead of that of 1875. Of course, it is entirely immaterial on which of the bonds in suit they are held liable, if held on either, the sureties being the same in both.

Upon the whole case, and after most careful deliberation, we are forced to the conclusion that the report of the referee is substantially correct, and was properly confirmed by the circuit court.

It should be said, in conclusion, that nothing in this opinion, or in the opinion in *State v. Bœtz, supra,* should be understood as reflecting in any degree upon the personal or official integrity of *Mr. Mills.* Since he was compelled to pay the judgment recovered against him by the assignee in bankruptcy he has steadily maintained that he ought not to account to the state for the $10,000 represented by the Bœtz

check. We regret that the effect of our judgment will necessarily be to compel him to account for the money the second time. But we can see no avenue of escape open to him; for, when he sought to befriend the Bank of Madison by giving it time on the Bætz check, which he received as money, he took the risk of the precise contingencies which afterwards happened, one of which was the risk of the penalties of the bankrupt law in case the bank should prove insolvent. It is greatly to his credit that the hospital has not suffered by this controversy, for he has paid all drafts upon him as promptly as though the $10,000 in controversy had not been adjudged to the assignee in bankruptcy. The only way in which he could bring the question of his liability for that money before the courts for adjudication and settlement was to pursue the course he did that is, to refuse to pay it over to his successor in office, so that an action might be brought for it. He should not be censured for so doing.

*By the Court.*— The judgment of the circuit court is affirmed.