THE BOARD OF SUPERVISORS OF MILWAUKEE COUNTY, Appellant, vs. PABST and others, imp., Respondents.

*November 1, 1887 — January 10, 1888.*

*(1, 2) Appeal to S. C.: Sufficiency of exceptions: Findings, when disturbed: Mistake of law. (3–5) Official bonds: Milwaukee court house fund: Liability of sureties on treasurer's bond.*

1. Separate exceptions to each of the findings of the trial court are sufficient to bring before this court the question whether the evidence sustains such findings.

2. The rule that this court will not disturb a finding of fact by the trial court unless it is against a decided preponderance of the evidence, does not apply where the finding was based upon and controlled by a mistaken view of the law.

3. Ch. 400, P. & L. Laws of 1871, created a special court house fund for Milwaukee county, and provided that the moneys belonging to such fund should be kept separate from all other moneys belonging to the county, and that no payments should be made therefrom except upon orders drawn in consideration of work done or materials furnished in the construction of the court house. Pursuant to the act the county treasurer gave a special bond, conditioned, among other things, that he should not pay out any moneys belonging to said fund except in the manner provided by the act. *Held*, that payments from such fund in discharge of general claims against the county constituted a breach of the bond.

4. The sureties on the special bond, and not those on the general bond of the treasurer, were responsible for the special fund. In 1874 it was enacted that the balance of the special fund should be turned over to the general fund of the county, and that thereafter the sureties on the treasurer's general bond should be responsible therefor. *Held*, that a mere formal transfer, if no money from the special fund ever in fact passed to the general fund, would not release the special bondsmen or render the general bondsmen responsible for the money which ought to have been transferred.

5. If, prior to the act of 1874 and the formal transfer of the special fund, the moneys belonging to that fund had been misappropriated by the treasurer, the sureties on his special bond are liable for such misappropriation unless the amount so misappropriated was afterwards replaced by the treasurer out of his personal funds; and the burden of showing such replacement is upon such sureties.

Board of Supervisors of Milwaukee County vs. Pabst and others, imp.

APPEAL from the Circuit Court for *Milwaukee* County.

The case is stated in the opinion. The plaintiff appealed from a judgment in favor of the defendants.

For the appellant there were briefs by *J. W. Wegner*, District Attorney, and *Turner & Timlin*, of counsel, and the cause was argued orally by *Mr. Timlin* and *Mr. Wegner.*

For the respondents there was a brief signed by *Cotzhausen, Sylvester, Scheiber & Sloan*, and *F. W. Cotzhausen*, of counsel, and the cause was argued orally by *F. W. Cotzhausen.* To the point that the plaintiff's exceptions are general and cannot therefore be reviewed on appeal, they cited *Newell v. Doty*, 33 N. Y. 83; *Smith v. Coolbaugh*, 21 Wis. 427; *Paggeot v. Sexton*, 23 id. 195; *Thomas v. Mitchell*, 27 id. 414; *Klatt v. Mallon*, 61 id. 542; *Gillett v. W. C. Co.* 44 id. 463; *Musgat v. Wybro*, 33 id. 515.

The following opinion was filed November 22, 1887:

TAYLOR, J. This action is brought to recover against the respondents as sureties upon the official bond of Edward Ehlers, deceased. The material facts in the case are the following: At the general election in 1872 Edward Ehlers was elected treasurer of the county of Milwaukee, and he assumed his office in January, 1873; his term of office expired in January, 1875. Upon rendering his final account to the county it was found that he had converted something over $10,000 of the funds belonging to the county, and was unable to, and failed to, pay that amount to his successor in office, as required by law. When he assumed his office, in 1873, there came into his hands, as treasurer of said county, two separate funds. One fund was what is termed the general fund of the county, consisting of the moneys received from taxation and other sources, the custody and disbursement of which was, by the general laws of the state, committed to the treasurer of the county. The other fund was a special fund arising from a sale of the

bonds of the county to raise money for the special purpose of erecting a court house for the use of said county. When Ehlers assumed his office, in January, 1873, there was the sum of $94,073 in the hands of his predecessor in office, belonging to this special fund; and on the 8th day of January, 1873, this sum was delivered to the said Ehlers, as treasurer of said county, and by him deposited, on that day, in the Second Ward Bank of the city of Milwaukee, in said county, to his credit as treasurer of said county of Milwaukee, and an account opened by said Ehlers as treasurer of said county with said bank.    On the bank-books the account was designated as the Court House Fund.

Before entering upon the duties of his office, the said Ehlers gave his bond, with satisfactory sureties, required to be given by the treasurer under the general law of the state, and at the same time he gave a bond as required by ch. 400, Private and Local Laws of 1871.  Sec. 3 of said ch. 400, P. & L. Laws of 1871, after providing how the bonds of the county should be issued and how negotiated, provides " that the county treasurer shall keep and maintain all moneys received from the sale of the bonds so to be issued, in a fund separate from all other moneys belonging to said county, and no part of the said bonds, or of the money arising from the sale thereof, shall be expended for, or applied to, any purpose, except to defray the expense of building a court house for said county; and the said treasurer and his sureties shall be liable to said county for misapplication of the same or any part thereof; and the said treasurer, before he shall receive said bonds for any purpose whatever, shall execute to the county board of supervisors of said county a bond, with three or more sureties, in the penal sum of double the amount of the bonds so to be received by him, conditioned that he will perform faithfully all orders and resolutions of said county board of supervisors which may be passed by virtue of the powers

conferred upon said board by this act; that he will keep the bonds received by him safely; *that he will keep the moneys received by him, and arising from the sale of said bonds, safely and separately from all other moneys belonging to the said county of Milwaukee, and that he will not pay out the same, nor any part thereof, except in the manner herein prescribed.*" The act then provides for the approval of such bond. Sec. 5 of said act provides that all county orders drawn on the treasurer of said county, which are to be paid out of the moneys received on the sale of said bonds or any part thereof, shall contain the words following, to wit: "On court house contract." And the treasurer shall pay no county orders drawn on him or against the said county, out of moneys received by him in the sale of said bonds or any part thereof, unless such order or orders shall contain the said words, "on court house contract." And the chairman of said county board of supervisors is hereby prohibited from signing, and the clerk of said board from countersigning, any county order of said county which shall contain the said words, "on court house contract," unless the consideration for such order be for work done, or materials furnished, or both, in the construction and erection of said court house.

When Ehlers assumed the office of treasurer in 1873, the bonds had been sold by his predecessor in office, and there remained in his hands the said sum of $94,073 of the money received upon the sale of said bonds, which had not been expended in the construction of said court house up to that time, but was subject to the orders of the county board for that purpose. Before said predecessor paid over this $94,073 to Ehlers, his successor in office, said Ehlers executed his bond to the said county board of supervisors in the penal sum of $200,000, with the respondents as his sureties, conditioned as follows: "Whereas the above bounden Edward Ehlers was, on the 5th day of November, A. D.

1872, elected county treasurer of Milwaukee county for the term of two years commencing on the first Monday of January, 1873, and whereas William Kennedy, the present county treasurer of said county, has in his hands certain moneys received by him, and being the proceeds of the sale of certain bonds issued by said county of Milwaukee and sold for the purpose of raising money to build a court house for said county: Now, therefore, the condition of this obligation is such that if the said Edward Ehlers shall keep the said moneys received by him, and arising from the sale of said bonds, safely and separately from other moneys belonging to the said county of Milwaukee, and shall not pay out the same or any part thereof, except in the manner provided by chapter 400 of the Private & Local Laws of Wisconsin of the year 1871, then this obligation to be void, otherwise of full force, effect, and virtue." It is upon this bond this action is founded.

In 1874 the legislature passed an act in regard to this court house fund, viz., ch. 178, Laws of 1874. Sec. 1 of this chapter reads as follows: "That all moneys heretofore raised in the county of Milwaukee under and in pursuance of chapter 488 of the Private & Local Laws of 1870, chapter 400 of the Private & Local Laws of 1871, as amended by chapter 40 of the Private & Local Acts of 1872, entitled 'Acts to empower the county of Milwaukee to raise money to build a court house,' or either of said acts, and not expended, be and the same is hereby turned over to the general fund of the treasury of said county, and made a part thereof; and that the treasurer and his sureties be and they are hereby made liable for said money, the same as any other money in said county." This was published March 27, 1874, and took effect on that day. The acts of 1870 and 1872, referred to in the act of 1874, do not in any way change the provisions of ch. 400, P. & L. Laws of 1871, except that the act of 1872 allowed the issuing of bonds to a larger amount than the act of 1871.

The evidence in the case shows that on the 27th of March, 1874, when ch. 178, Laws of 1874, took effect, there remained of said court house fund, unexpended for the purposes for which it was raised, the sum of $12,814.84, and on the 2d day of May, 1874, the sum of $12,564.84; and that on this last-mentioned date the said Ehlers, county treasurer, made a formal transfer of said $12,564.84 then appearing to the credit of said court house fund to the account of the general funds belonging to the county, and no further account was thereafter kept of said court house fund separate from the general funds of the county.

It also appears from the records of this court, and from the evidence produced upon the trial of this action in the circuit court, that the said county board of Milwaukee county had, previous to the commencement of this action, brought an action upon the general bond of said treasurer, against him and his sureties on such general bond, for the purpose of recovering the said sum of over $10,000 which remained unaccounted for by said treasurer. That case was referred to the Hon. A. R. R. Butler of Milwaukee, to hear, try, and determine the same; and after hearing the evidence in the case he found that, prior to March 27, 1874, Ehlers had converted, and appropriated to his own use, $10,150.30 of the said court house fund, and that he did not convert or appropriate to his own use any other moneys of the county, except such as were part of the sum of $94,073, being the money belonging to the said court house fund; and he also found, as a matter of law, that the sureties on the treasurer's general bond were not liable to the county for the conversion of said court house fund, if converted before the act of March, 1874, took effect. This opinion and decision of Mr. Butler was confirmed by the circuit court, and upon appeal to this court the judgment in that case was affirmed. See *Milwaukee Co. v. Ehlers*, 45 Wis. 281. The case in 45 Wis. 281, and *Mil-*

*waukee Co. v. Pabst*, 45 Wis. 311, settled several questions of law which arise in this case. It was decided in these cases — *First*, that the law of 1871 required that the special bond therein specified should be given, not only by the county treasurer who was charged with the negotiation of the court house bonds, but also by his successor in office during the existence of such fund, and that consequently the bond upon which this action is brought was given in pursuance of the statute; *second*, that the sureties on the treasurer's general bond were not to be held responsible for the safe-keeping and disbursement according to law of the special court house fund in the hands of the treasurer. These questions of law having been settled in the former case, there does not seem to be any question to settle in the present case, except one of fact. It is admitted that when the treasurer rendered his final account in January, 1875, he was short something over $10,000, which neither he nor his sureties have made good in whole, and that on the trial of this action there still remained due from the treasurer to the county the sum of $8,260.76, with interest thereon from the 20th of January, 1875. The only question is whether this sum is chargeable to the sureties on the general bond, or to the sureties on the special bond upon which this action is now brought.

The learned circuit judge who tried the case made his findings, ten in number. As to the first four findings there is no dispute. Ehlers was the treasurer; the defendants executed the bond in suit; the bond was approved on the 8th of January, 1873; William Kennedy, the predecessor in the office of Ehlers, paid over to him the said sum of $94,073 belonging to the court house fund. The fifth finding, if it means that Ehlers did in fact transfer the unexpended balance of the court house fund to the account of the general fund, we think, as hereinafter stated, is not supported by the evidence; but if this finding simply

means, as we are inclined to think the judge intended it to mean, that a formal entry was made on the treasurer's books, transferring such balance to the account of the general fund, then there is no dispute as to that finding. The sixth, seventh, and eighth findings are not questioned.

The following are the ninth and tenth findings:

"That the general funds of the county, for a short time after entering upon his office, were kept by Ehlers on deposit in the Bank of Commerce; but soon thereafter, to wit, on the 10th day of February, 1873, the official account as treasurer was discontinued, and the moneys belonging to the county were commingled by him with his private funds, and used indiscriminately for official and individual purposes; which state of things continued uninterruptedly until the end of his term. That the proofs do not demonstrate with sufficient certainty to satisfy the court in all instances to what fund moneys deposited or drawn belonged, nor to which account they should be charged, so that it has not been possible for it, having called in expert accountants to its aid, to state an account which will indicate when the deficiency arose or to which fund it belongs. That the plaintiff, having the burden of proof, fails to overcome the effect of the testimony of Ehlers that the deficiency did not arise in the court house funds, and the testimony of Chas. C. Schmidt, tending to show that from the 27th day of March, 1874, until the 2d day of May, 1874, there was on deposit in the Second Ward Savings Bank, to the credit of the 'Court House Fund, Edward Ehlers, Treasurer,' moneys in excess of the amount then due and owing, and that the balance of this fund on May 1, 1874, was, on the 2d day of May, 1874, drawn out in two certificates of deposit, which were applied in discharge of interest on court house bonds, and the school fund properly chargeable to county expenses.

"That it is not established by the evidence in this case,

as presented, to the satisfaction of the court, and this court cannot find as a matter of fact from the proofs adduced, that, between the 8th day of January, 1873, and the 2d day of May, 1874, the said Ehlers had misapplied or appropriated to his own use and benefit any of the moneys to the credit of the court house fund, as charged in the complaint."

These findings of fact were each separately excepted to by the appellant. The learned counsel for the respondents urges that because the plaintiff excepted to each and every finding of fact, although there be a separate exception to each finding, this amounts in law to one general exception to all the findings; and he cites several decisions of this court which he claims sustain this contention. We do not think the authorities cited sustain the learned counsel in his proposition. All the cases referred to were cases in which the exception was a general one to several findings, and not separate exceptions to each finding. If the party is of the opinion that none of the findings of fact are sustained by the evidence, we can conceive of no other way in which he can bring the several findings before this court for review except by a separate exception to each of them. There can be no doubt, we think, but that the exceptions are sufficient to bring the question before this court as to the sufficiency of the evidence to sustain the findings.

The only material findings about which there is any question are the ninth and tenth findings above quoted. The learned counsel for the respondents invokes the well-established rule in this court that a finding of fact by the trial court will not be reversed by this court on appeal unless the decided preponderance of the evidence is against the finding. We are not disposed to question this rule. But if it be evident from the finding that the trial court based its finding upon a mistaken view of the law as to the legal effect of the evidence produced, or upon the question

as to the party upon whom the burden of proof is cast at any stage of the trial, and his finding is controlled by such mistaken view of the case, then the rule above mentioned does not apply, and this court must find the fact upon the evidence without the aid of a finding by the trial court.

It seems to us that the learned circuit judge based his ninth and tenth findings — *first*, upon the idea that it was necessary for the appellant to prove as a fact that the treasurer had appropriated the court house funds before the 2d day of May, 1874, " to his *own use and benefit*," in order to show that he had misappropriated it in a way to charge his sureties for such misappropriation; and, *secondly*, in the ninth finding, the learned circuit judge says: " That the proofs do not demonstrate with sufficient certainty to satisfy the court, in all instances, to what funds money deposited or drawn belonged, nor to which account they should be charged." And he also seems to give considerable weight to the simple statement, without any explanation, made by Ehlers, that the deficiency was not in the court house fund, and the opinion of Chas. C. Schmidt, the expert witness, that he thought the deficiency in the funds did not arise until the latter part of 1874. The assertion of Ehlers can have no weight, when not sustained by the evidence in the case, and the opinion of Schmidt is in plain contradiction to the evidence of Ehlers, who testifies that he began to abstract the funds of the county for his own private purposes early in 1873.

Certain facts seem to us to be clearly established by the evidence: (1) That the court house fund was deposited by Ehlers in the Second Ward Bank when it first came into his hands in January, 1873; (2) that he never had any of those funds in any other place until after the 2d day of May, 1874; (3) that only the sum of $81,508.16 was ever drawn out of said court house fund upon orders which the treasurer was authorized to pay out of such fund; and (4) it is con-

clusively shown that part of the court house fund had been paid out by said treasurer, at different times, before the 5th day of February, 1874, and on that day it was all paid out, by the orders of Ehlers, to the state treasurer, in part payment of taxes due from the county of Milwaukee to the state, and his account at the Second Ward Bank was overdrawn $5,890.68. Although the account of the treasurer at the Second Ward Bank shows overdrafts upon his funds in that bank previous to the 5th day of February, 1874, there probably were no overdrafts of his whole account at that bank up to that date. It appears that this bank account was reduced the sum of $25,000 on the 22d day of April, 1873, but the evidence shows that this was not in fact a withdrawal of that amount of funds from the bank, but is charged in the bank account as bills payable, and, as explained by the testimony, was only a nominal withdrawal, for the purpose of the computation of interest. This sum was afterwards, and on the 27th day of October, 1873, again added to the credit of the treasurer, without any moneys being in fact paid into the bank at that time by the treasurer. Up to the said 5th day of February, 1874, Ehlers always had to his credit, in said Second Ward Bank, a large portion of the court house fund, although at times drafts had been made on it for general county purposes to the amount of several thousand dollars. The evidence, we think, clearly establishes the fact that the treasurer, Ehlers, never at any time kept the court house fund at any other place than in the Second Ward Bank. It also now appears pretty satisfactorily from the evidence that all the money drawn from the Second Ward Bank was drawn in payment of orders properly drawn upon the court house fund to the amount of $81,508.16, and that the other order or claims paid by the treasurer by checks upon the Second Ward Bank were drawn to pay claims, or were claims against the county of Milwaukee.

There are but two material questions in this case as the evidence now stands: *First.* On the 5th day of February, 1874, when Ehlers paid out the whole of this court house fund to pay a general debt of the county, did he violate the conditions of the bond upon which this action is brought? *Second.* If such disposition of the fund was a violation of his bond, did he afterwards, and before the 27th day of March, 1874, when ch. 178, Laws of 1874, took effect, or on the 2d day of May, 1874, when he formally transferred the court house fund to the general fund, replace with his own money the amount of such fund which ought then to have been in his possession?

That the paying out this court house fund for general county purposes previous to the day when ch. 178, Laws of 1874, took effect, was a breach of the special bond upon which this action is brought, there can be no chance for dispute. The statute creating this fund is very specific in its provisions; it expressly declares for what purposes it shall be used, and negatives the right to use it for any other purpose; requires the treasurer to keep it separate and apart from all other funds in his possession; and the bond given binds the treasurer to keep it separately, and not to use the fund except in the manner and for the purposes mentioned in the statute. There was, therefore, a clear breach of the conditions of this bond on the 5th of February, 1874. The breach was a substantial breach, and can only be cured by showing that the funds so wrongfully used by the treasurer were returned to said fund by him previous to the day when the balance in the Second Ward Bank was transferred to the general fund, or at some time thereafter and before the end of his term of office. This was the effect of the decision in the former case of *Milwaukee Co. v. Ehlers*, 45 Wis. 281. It was substantially held in that case that, having shown a misappropriation in the special fund, February 5, 1874, it became the duty of those

claiming that such misappropriation had been made good by the treasurer to show that he had, on or before the day that the general fund was credited with the balance that ought to have been on hand, made the fund good by replacing the amount so misappropriated to the credit of said fund. And it was also held in that case that the replacing to the credit of that fund the amount misappropriated, by placing to its credit the money belonging to the county for general purposes, did not cure the default. See pages 290–292 of said report. If the former decision did not go to that extent, it certainly went to the extent of holding that the treasurer could not make the default good by placing to the credit of that fund moneys he had received belonging to the general fund, unless he showed that he had in his possession, at the same time, money enough to make good the deficiency in the special fund in the Second Ward Bank, and also an amount equal to all the general funds of the county not then legitimately paid out for general county purposes. See *State v. Mills.* 55 Wis. 229.

The evidence as presented to this court in this case is substantially the same as that contained in the former record, with the exception that in the former case checks or drafts upon the funds in the Second Ward Bank, drawn by the treasurer upon that fund to the amount of several thousand dollars, were not clearly shown to have been drawn by the treasurer for any public purpose, and therefore it might have been urged, and perhaps was urged, that such checks and drafts were drawn for the personal benefit of the treasurer and not in payment of claims against the county. On the trial in this case most of these checks and drafts are shown to have been drawn to pay legitimate claims against the county. But this evidence does not change the fact that the special fund was entirely misappropriated on the 7th day of February, 1874. In law it was as much a misappropriation of this special fund to pay it out in discharge of general claims

against the county, as to pay it out for personal claims against the treasurer. That this deficiency was not made good in the special fund after the 7th of February, and up to the 2d of May, 1874, when a formal transfer of the special fund was made to the account of the general fund, seems to be very clearly shown by the evidence, as contended for by the learned counsel for the appellant in their brief upon this point.

The evidence shows that after the 7th day of February, 1874, and previous to the 2d day of May, 1874, all the money deposited in the Second Ward Bank by the treasurer was money belonging to the general funds of the county, except two sums of interest amounting in all to the sum of $569.18. The moneys belonging to the county, deposited in said bank during the same time, amounted in all to the sum of $60,796.47. The money drawn out of the bank in the mean time for all purposes was $38,356.43. The overdraft on the 7th of February was $5,890.68. This, added to the money drawn out, makes $44,247.11. This sum deducted from the amount of county funds paid into the bank, leaves the sum of $16,549.36. Add to this the two items of interest, $569.18, and the balance remaining in the bank, May 2, 1874, is $17,118.54. The evidence shows that this amount of money was in the Second Ward Bank, to the credit of the treasurer, May 2, 1874, when the formal transfer was made to the general fund of the balance remaining unexpended of the court house fund, namely, $12,562.88. It is evident, however, that none of this money was the private property of the treasurer, except the sum of interest above mentioned, $569.18. All the balance of the money in the bank was the money of the county, belonging to the general fund. There was nothing therefore in the bank account belonging to the treasurer which could be lawfully applied to make up the deficiency in the special fund at that date, unless it was made to appear that he had,

at that time, money on hand, over and above the public money in his hands, sufficient to make up such deficiency in said special fund.    That he had no such money in his possession or under his control at that date, seems to be fully established by the evidence, as is also very clearly shown in the brief of the learned counsel for the appellant.    The evidence shows that on the 2d day of May, 1874, there should have been in the hands of the treasurer, of the special and general funds, the sum of $68,162.57.    The evidence further shows that on said day the treasurer had in the Second Ward Bank to his credit the sum of $17,118.54, in the Bank of Commerce the sum of $29,281.94; and it also appears that he then held a note of Aschermann & Co. for money loaned, $5,000, which was treated as public money.    These several sums amount to $51,600.48, or $16,762.12 less than the actual balance of the funds not paid out by him at that time and which he should have had on hand.    The evidence is quite satisfactory that Ehlers had no other money at the time except, perhaps, a few thousand dollars which the evidence tends to show was kept in the office for the payment of small claims without drawing upon his bank account. The evidence strongly tends to show that the sum so kept in the office did not usually exceed the sum of $3,500; many times it was much less, and at some times it may have been more; but the probabilities are against it exceeding that sum.    There is some evidence in the case showing that at times checks were made on the bank accounts to replenish this office fund, but that such checks certainly did not exceed the sum of $3,500 at any one time.    Giving the treasurer the benefit of this $3,500, and he was, on the 2d day of May, 1874, short in his accounts with the county about $10,100.    This shows that on that day he had not made good the deficit in the special court house fund.

If it be urged by the respondent that the evidence does not conclusively show that the treasurer had not other funds,

this objection is answered by the suggestion that, the appellant having shown a misappropriation of this special fund on the 7th of February, 1874, it was for the respondents to show that it had been made good on the 2d of May, 1874, and not for the plaintiff to show the negative. If the evidence is defective or uncertain, the fault is the respondents', and not the plaintiff's. See *Coons v. People*, 76 Ill. 383; *U. S. v. Earhart*, 4 Sawy. 245.

The same result is reached in other ways as shown by the brief of counsel for appellant. If the treasurer did not have this money on hand, May 2, 1874, when he made a formal transfer of the same to his general fund account, then his sureties on that account are not liable for the default. The case is similar to the case of two sets of bondsmen for the same officer, when he is elected to succeed himself. The bondsmen for the first term are liable for all defaults during that term; the bondsmen for the second term are liable for all defaults during the second term, and a mere formal transfer of any balance which ought to have been on hand at the expiration of the first term to the account of the second term will not make the second bondsmen liable, when the fact is established that no funds were in fact on hand to transfer to the account of such second term. *U. S. v. Earhart*, 4 Sawy. 245; *Bruce v. U. S.* 17 How. 437; *Vivian v. Otis*, 24 Wis. 518; *State v. Mills*, 55 Wis. 229. In the case at bar the general bondsmen are liable for any default in the general funds of the county; the bondsmen on the special bond are liable for any default in the special fund; but by the act of March, 1874, the special fund is transferred to the general fund, and after such transfer the general bondsmen became liable for the fund so transferred; but when it appears that such transfer was a mere formal one, and that no money from the special fund ever in fact passed to the general fund, it is clear, under all the authorities, that the bondsmen upon the general bond are not liable for the sum

which ought to have been transferred to the general fund but was in fact not transferred.

If the evidence be applied to the situation of affairs on the 27th of March, 1874, when the act of the legislature declared the balance of the special fund should thereafter be considered as a part of the general fund and that the general bondsmen should thereafter be responsible for the same, the evidence does not make any better showing in favor of the special bondsmen.

The evidence having, as we think, satisfactorily shown that when the formal transfer of the balance of the special court house fund was made by Ehlers on his official books, on May 2, 1874, and on the 27th day of March, 1874, when the act of the legislature declared that this balance should thereafter be a part of the general funds of the county and that the bondsmen for the general fund should be thereafter accountable therefor, there was, in fact, no balance of such special fund in the hands of the treasurer, and therefore none was transferred to the general account, either by the formal transfer made on the treasurer's book, or by the act of the legislature of March 27, 1874, it is evident that, upon legal principles, the general bondsmen are not liable for such balance of the special fund, and that the special bondsmen are liable for its misappropriation, unless it has been clearly shown that, after said dates, said treasurer has paid out of his personal funds claims chargeable to the general funds of the county to an amount equal to the deficit in such special fund. Had this been shown, the default of the special bondsmen would have been cured, and the ultimate shortage would be chargeable to the general bondsmen. See *State v. Mills*, 55 Wis. 229, 244. Such payment out of his personal funds would have been an equivalent, so far as the county is concerned, to making an actual transfer of the money at the dates mentioned, in the absence of evidence showing that the treasurer, after

such dates, had actually converted to his own use any of the general funds of the county.

There is no evidence in this case showing that any such thing was done by the treasurer. But the learned counsel for the respondents insists that there is evidence in the case which tends to show that this must have been done. He insists that the evidence shows that on the 1st day of November, 1874, the treasurer had deposited in the Bank of Commerce money to his credit, amounting to more than $10,000 more than the amount of the public funds then in his hands; and he therefore argues that he must have made up all deficiencies in his accounts with the county to that date, and had a surplus to his personal credit of over $10,000. If the fact was clearly established as it is claimed by the learned counsel of the respondents, there would be great force in the claim that the deficit in the treasurer's account must have taken place after that date. But upon a consideration of all the evidence in the case we think the fact is not established. The evidence, it is true, shows that on the 1st of November, 1874, the credit of the funds in the treasurer's hands was only the sum of $3,754.84, and that on that date he had a credit of $13,715.64 in the Bank of Commerce. This would, as claimed and unexplained, show that the treasurer was not short on that particular day. But there is other evidence which pretty clearly shows that this apparent surplus of funds on that particular day was merely apparent and not real.

The evidence also shows that on the 1st day of October, 1874, the treasurer had to his credit only the sum of $4,174.07, and that on the same day the funds in his hands had a credit of $30,289.28; that on December 1, 1874, the treasurer had nothing to his credit in said bank, and had overdrawn his account $609.24, and that the funds in his hands had a credit of $13,743.83. This apparent surplus in the bank, November 1st, is, we think, accounted for by

the learned counsel for the appellant.   The evidence shows that at this time a loan of $25,000 was made by the county of the Bank of Commerce to meet the current demands upon the treasury.   It is true that in his annual report the treasurer says that on the 2d of November, 1874, he received the avails of this loan, viz., $24,316.70; but as the evidence in the case shows that his balance in the Bank of Commerce constantly decreased after the 1st day of November, 1874, until it was overdrawn, December 1, 1874, it is quite probable that he had the benefit of this $24,316.70 in his account with the bank on the 1st of November, instead of on the 2d, as stated in his report.   There is no other plausible way of accounting for the apparent surplus of funds in the hands of the treasurer on the 1st of November, 1874, and this supposition will make it consistent with all the other evidence in the case.   Giving the county funds credit for this $24,316.70, on the 1st of November, 1874, and then the funds would have a credit on that day of $28,071.54, and his bank account being but $13,715.64, leaving him short $14,354.90, which is consistent with all the other evidence in the case.

It is urged by the learned counsel for the respondents that the shortage in the treasurer's account was undoubtedly created by his expenditures of the public funds in his attempt to be re-elected in 1874.   We do not think this contention can be sustained, for two reasons: *First*, it is contrary to the direct evidence of Mr. Ehlers, who testifies that the misappropriation of the funds commenced early in his term of office, and continued until about the last of November, 1874; and, *second*, this claim would, upon the theory of the learned counsel for the respondents that Ehlers had on hand, November 1, 1874, about $10,000 more than he was indebted to the funds in his hands, prove that in the month of November, 1874, he expended for his personal purposes the said sum of $10,000, and the further sum

Board of Supervisors of Milwaukee County vs. Pabst and others, imp.

of $14,000, or over $24,000; for the evidence shows that, on the 1st of December, 1874, Ehlers was short in his accounts with the county over $14,000. Of this shortage, the general bondsmen paid, in December, 1874, $3,500, leaving a balance of over $10,000 short at the expiration of his term of office, and being a less amount than the shortage of the special court house fund, May 2, 1874. Notwithstanding the reputed liberality of candidates for county and other offices in the city of Milwaukee, we are not prepared to find, upon the uncertain evidence in this case, that Mr. Ehlers expended $24,000 in his attempt to be re-elected in November, 1874, but are rather inclined to believe that the sum of $3,500 which was immediately afterwards contributed by his general bondsmen towards making up the shortage in his accounts, was a nearer approach to his expenditures in that contest.

There is nothing which has been done by the county board of supervisors which should estop the county from enforcing its claim against the respondents. See *Jefferson Co. v. Jones*, 19 Wis. 51; *Kewaunee Co. v. Knipfer*, 37 Wis. 496; *Chenango v. Birdsall*, 4 Wend. 453. After a careful consideration of all the evidence in the case, we see no reason for changing the opinion we came to in the former case, viz., that the shortage in the account of the treasurer, to the extent at least of the balance remaining unaccounted for, was in the court house fund and not in the general fund.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with direction to that court to enter judgment in favor of the appellant and against the respondents for the sum of $8,260.27, with interest on said sum at the rate of seven per cent. per annum, from the 20th day of January, 1875, to the date of the entry of such judgment.

A motion for a rehearing was denied January 10, 1888.