SCHOOL DISTRICT No. 1 OF THE CITY OF HAYWARD, Respondent, vs. LARSON and another, Appellants.

*March 9—June 18, 1928.*

For the appellant Larson there was a brief by *Fuller & Lampson* of Cumberland, and oral argument by *W. H. Fuller.*

For the appellant Maryland Casualty Company there was a brief by *Coleman, Murphy & McCauley* and *McGovern, Lyons, Curtis, Devos & Rice,* and oral argument by *Francis E. McGovern* and *James E. Coleman,* all of Milwaukee.

*W. T. Doar* of New Richmond, for the respondent.

The following opinion was filed April 3, 1928:

CROWNHART, J.   The learned trial court, in addition to the findings of fact above set forth, filed a very able and comprehensive opinion, which is printed in the margin.[1]

---

[1] "The plaintiff sued the defendants on the official bond of the defendant Larson, as treasurer of the school district, to recover the sum of $18,899.80, with interest from July 7, 1924. The defendant Larson was elected treasurer of the school district at the annual meeting held in July, 1922, for a term of three years. On November 7, 1923, he executed and delivered his official bond as alleged in the complaint, in the penal sum of $25,000, which bond was executed by the defendant Maryland Casualty Company as surety. Most of the money of the district was deposited in the First Na-

This opinion throws the spot light on the situation so that the facts stand out in their true relation.

The situation was unusual. Hayward was still in the pioneer stage, largely built from the lumber industry. The municipal officers, no doubt, were not so familiar with their duties as similar officers in older settled communities. Hayward had a national bank, and its officers, Henry E. Rohlf, president, and Ernest E. Rohlf, cashier, took a prominent part in its municipal affairs. Ernest Rohlf was a director of the plaintiff school district during the period in review here, up to the date of his death, October 28, 1923. He was clerk of the high school district. He was agent for most of the

---

tional Bank of Hayward. The bank suspended business and closed its doors on or about March 7, 1924. At the annual meeting of the district in July, 1924, the clerk of the district reported that there was $18,899.80 of the money of the district in the hands of the bank. The treasurer made no formal report at that meeting, but admitted that the statement of the clerk was correct and that he was unable to obtain this money by reason of the failure of the bank. The business and affairs of the bank were taken over, liquidated, and distributed to creditors by the proper officers of the United States and by a receiver placed in charge. After the failure of the bank the treasurer filed a claim with the receiver for $18,899.80, which claim was allowed, and a final dividend of $3,073.65 was paid thereon on March 25, 1926. The money so collected was recovered back into the treasury of the district. If plaintiff is entitled to recover anything, the amount of such recovery is the amount sued for, with interest, less the amount of said dividend. During the trial of the action the jury was discharged and a jury trial waived by stipulation of the parties.

"Two defenses are urged and relied upon by both defendants and a third defense by the Casualty Company. These defenses are, in substance, as follows:

"1. That the money lost by the failure of the bank was not the money of the plaintiff.

"2. That the money so lost never came into the possession of the treasurer; and

"3. That said loss occurred before the time of the execution and delivery of the bond.

"The facts bearing on the first and second defenses are so connected that they will be considered together. They relate to certain money received by the bank during the school year beginning July 3, 1923, as insurance on the school building that burned June 21, 1923. The questions involved in the third defense are questions of law which will be considered later. The facts are

insurance companies insuring the properties of the two districts. The bank was the depository of most of the funds of the plaintiff school district, the high school district, as well as of other municipalities in that locality. The bank and its officials were highly regarded and trusted by the public officials and citizens, generally.

Larson, the treasurer of the common school district, trusted the bank and its officials to the extent that he permitted them to collect, keep, and pay out the funds of the district without check or control. Larson treated them as his agents to perform his official duties. He had been treasurer for the district one term prior to 1922, and had handled

numerous and some of them are quite unusual, but they are not particularly complicated or difficult to understand. They are mostly undisputed, there being little, if any, material conflict in the testimony.

### "Title and occupation of school property.

"The land on which the school building stood was purchased by School Subdistrict No. 1, town of Hayward, by a deed from the North Wisconsin Lumber Company on September 1, 1884. The school was then under the township system of government. A school building was erected upon this land by the subdistrict. The county board of education on and prior to July 20, 1915, pursuant to chapter 751, Laws of 1913, organized the plaintiff district, which succeeded to the rights of the subdistrict, and thereby acquired title to the property. The territory included in this district is co-extensive with the city of Hayward. A high school was also maintained on the property. The Hayward town free high school district was reorganized by chapter 42 of the Laws of 1917. Its territory includes the city of Hayward and other adjacent property. For convenience this district will be called the 'High School District,' and the plaintiff will be called the 'Common School District,' which are the names by which they were designated in the testimony. Several years ago, the exact time not being shown by the testimony, the high school district or its predecessor built an addition to the school building on the plaintiff's land. From that time until the time of the fire the schoolhouse was occupied and used jointly by both school districts. Adjustments of expenses of maintenance were made from time to time between the districts, including expenses for fuel, light, janitor service and insurance.

### "The officers of the school districts and of the First National Bank.

"In the year 1923 and prior thereto, the officers of the common school district were J. C. Davis, clerk; Ernest E. Rohlf, director, and G. A. Larson, treasurer. During the same time the officers of

the money in the same way. He treated the bank as his agent, and permitted it to handle all the funds.

The bank and its officers proved faithless to their trust; they embezzled the trust funds, forged securities, and falsified the records. It failed in March, 1924. Henry E. Rohlf, its president, became a convict as a result of crime in connection with the bank. Ernest E. Rohlf came to his death in an automobile accident October 28, 1923.

Growing out of these relations, this action was involved in several complex situations. But so far as the facts are concerned, a careful study of the evidence convinces this court that the learned trial judge arrived at correct conclu-

the high school district were Ernest E. Rohlf, clerk; G. A. Larson, director, and C. M. Peterson, treasurer. The officers of the bank were Henry E. Rohlf, president, and Ernest E. Rohlf, cashier. J. C. Davis is an attorney at law, practicing at Hayward. G. A. Larson is a practicing physician at Hayward. C. M. Peterson is a farmer.

"Prior to the failure of the bank the Rohlfs had the general confidence of the community. They were the local agents of most of the insurance companies which wrote the insurance on the school building. Ernest E. Rohlf was the city treasurer. The First National Bank, under the management of the Rohlfs, received, handled, and disbursed the money of the school district. Prior to the failure of the bank Dr. Larson never personally received or personally disbursed any money of the district except that he received one item of $92 from the sale of junk, which money he deposited in the bank. During that time he left the receipt and disbursement of school money to the bank and its officers. School orders were not even presented to the treasurer for payment. He kept no books of account as school treasurer during that time. The Rohlfs handled the money of the high school district in much the same manner. They also received and handled money of other municipalities.

"On October 28, 1923, Ernest E. Rohlf was killed in an automobile accident. J. S. McGeorge was appointed his successor as director of the common school district, and Henry E. Rohlf was appointed his successor as city treasurer. Later, Ella Phalen was elected clerk of the high school district. After the bank failed it was discovered that the Rohlfs were not worthy of the public confidence they had received. The books of the bank had been kept in balance, probably for the purpose of escaping detection by bank examiners. Considerable juggling and manipulation of accounts were afterwards discovered, as well as entries on the bank books as part of its assets of forged and fictitious notes. Most of the entries on

sions. Where the records were silent he had to rely on the best evidence obtainable, and thus at times oral evidence supplied the facts where such facts should have been a matter of record. There is conflict in such evidence, but the trial court was in the best position to weigh the evidence and determine the credibility of the witnesses.

We shall not rehearse the evidence here. It is voluminous. It has been exhaustively treated in the opinion of the trial judge, appended. Suffice to say that it amply justifies, in our opinion, the findings of fact made by the trial court.

Most of appellants' assignments of error are disposed of by our confirmation of the findings of fact. The appellants

---

the bank books, both of debit and credit, in the account of each school district, were false and fictitious, so far as they can be compared by other evidence with the true condition of the accounts. When Dr. Larson filed his annual reports as school treasurer, he obtained the information from Ernest E. Rohlf. The report he filed June 30, 1923, is in the handwriting of Ernest E. Rohlf. That report contains all the items of debit and credit and it is correct in all respects except that no balance is struck, which is a mere matter of computation. The account as contained in that report, when compared with the bank ledger for the same time, shows that none of the items entered on the bank ledger correspond in any respect with the items shown in the report, and that the bank account consists largely, if not entirely, of false entries. Henry E. Rohlf is now serving a sentence in the federal prison for violation of banking laws. While Dr. Larson utterly disregarded his duties as school district treasurer, he has not been accused of any intentional dishonesty. He served the balance of his term, was re-elected treasurer in July, 1925, and is now the present incumbent. Fairly accurate records were kept by the clerk of the common school district. If Ernest E. Rohlf, as clerk, or any one else kept any records of the high school district between January 18, 1923, and November 6, 1923, no such records have been found.

"*The insurance and the proceedings to transfer the interest of the high school district in the school building and insurance to the common school district.*

"On June 26, 1922, at an annual meeting of the electors of the high school district, a motion was adopted relating to the sale of its interest in the school building to the common school district. No record of the motion was found or produced. F. R. Nash, the city superintendent of schools, testified that the motion was to the effect that the common school district was requested to determine at its next meeting what price it would pay for the high school interest

fail, we think, to fully appreciate the duties incumbent upon Larson as school district treasurer. Larson may be absolved from any personal peculation of the funds of the school district. However, as treasurer of the district, Larson had certain duties to perform. Sub. (2), sec. 40.19, Stats. 1923, provides:

"The treasurer shall apply for and receive from the town treasurer all money apportioned to or collected for the district and pay money on the order of the clerk countersigned by the director, and not otherwise. He shall turn over to the county treasurer for the benefit of the school fund all forfeitures accruing under subsection (2) of section 39.15. He shall keep a book in which he shall enter all the money re-

in the school building or at what price it would sell its own interest in the building. Dr. Larson testified that the electors authorized the sale of the high school interests for $20,000. On July 3, 1922, at the annual meeting of the electors of the common school district, a resolution was adopted that the board of education be authorized to purchase the interest of the high school district in the school building for $20,000, or, failing to make such purchase, they be authorized to sell the interest of the common school district to the high school district for a like sum. On July 7, 1922, according to the testimony of J. C. Davis, both school boards met, all members being present. The high school board accepted the proposition to sell the high school interest in the building for $20,000, the money to be paid when the high school quit using the building. A new high school building was then contemplated. Mr. Davis kept no record of this meeting. If Ernest E. Rohlf did so, the record has not been found. There is some conflict in the testimony on this subject. C. M. Peterson testified that he did not remember of being present at that meeting. Dr. Larson testified that he was not present, but that he was informed by Ernest E. Rohlf soon afterwards that the matter had been settled. Prior and subsequent to July 7, 1922, both parties consistently traveled a road leading towards and passing such a point of settlement. The claim that they did so without reaching the point is incredible in view of all the circumstances. I am satisfied that the testimony of Mr. Davis on this subject is substantially correct.

"Proceedings were thereafter taken by the high school district to erect a new school building on other lands and to pay for it by issuing bonds and using the $20,000 to be received from the common school district. On July 22, 1922, a special election was held by the electors of the high school district for this purpose, at which election 751 votes were cast. The election resulted in a majority of 215 votes cast in favor of the proposition. Bonds were thereupon issued and sold. A new site was procured and a new high

ceived and disbursed by him, specifying particularly the sources from which the same has been received, the persons to whom and the object for which the same has been paid, and shall afford the clerk access thereto when desired to enable him to make his annual report. He shall present to the annual meeting a report in writing containing a statement of all moneys received by him during the preceding year and of each item of disbursement made by him and exhibit the voucher therefor."

The oath of office of the treasurer is provided for in sub. (1), sec. 19.01, Stats. 1923. The form of bond the treasurer is required to give is provided for in sub. (2),

school building was erected on the new site. In the meantime and until the spring of 1923, the old building was used jointly by both districts as before. On June 21, 1923, the old school building burned and became substantially a total loss. The amount of insurance on the building was then $94,000. Most of the insurance was written by the Rohlfs. Most of it was written in the name of the high school district. A few policies were written in the name of the school board or board of education. The amount of the insurance was much higher than the school officers, other than Ernest E. Rohlf, knew about until after the fire. The insurance was covered by twenty-six different policies. The insurance was adjusted at $89,586.25, of which amount $80,252.80 was for damages to the building and $9,333.45 was for damages to its contents. All proofs of loss were made up and signed by Ernest E. Rohlf as clerk of the high school district for various sums corresponding to adjustments made, aggregating the amounts above stated. On June 30, 1923, after the fire, and before any of the insurance had been collected, a school order was drawn by the common school board in favor of the high school district for $20,000 for the money agreed to be paid for the high school interest in the property. A record of the order appears in the record of school orders and is entered under the heading 'Building.' It also appears as a disbursement of Dr. Larson in his annual report of June 30, 1923, made in the handwriting of Ernest E. Rohlf as follows: 'Paid for building to high school, $20,000.' At this time the only interest the high school district had in the building or property was its interest in the uncollected claims for insurance. On July 2, 1923, at the annual meeting of the electors of the common school district, a motion was adopted authorizing the school board 'to build a new school building for the amount of money to be received for the insurance.' The entire insurance of $89,586.25 was paid; most of it, and perhaps all of it (although as to a small portion the evidence is silent), was paid in checks or drafts payable to the high school district or its treasurer. Most of it was paid in July, 1923. The balance was

sec. 19.01. The official duties referred to in sub. (1) and (2), sec. 19.01, are defined in sub. (3), sec. 19.01, as follows:

"The official duties referred to in subsections (1) and (2) include performance to the best of his ability by the officer taking the oath or giving the bond of every official act required, and the nonperformance of every act forbidden, by law to be performed by him; also, similar performance and nonperformance of every act required of or forbidden to him in any other office which he may lawfully hold or exercise by virtue of his incumbency of the office named in his official oath or bond. Except as provided otherwise by sub-

paid within the next few months. Of this money there was collected from insurance companies by the Rohlfs and received and deposited in the First National Bank, $78,107.57. The Farmers State Bank collected from insurance companies and received $11,478.68. The Farmers State Bank made an effort to secure a larger portion of these deposits. This effort resulted in Ernest E. Rohlf taking three packages of money of $5,000 each to the Farmers State Bank, with instructions to deposit the money to the credit of G. A. Larson as treasurer of the common school district. The money was so deposited, together with the $11,478.68. The deposits of the insurance money were then as follows: In the First National Bank, $63,107.57; in the Farmers State Bank, $26,478.25. The money deposited in the Farmers State Bank was all used for the benefit of the common school district. About the time the money was collected, Ernest E. Rohlf informed Dr. Larson that he had collected the money and would deposit it to the credit of the account of the common school district. After the bank failed, Herman E. Rohlf informed Dr. Larson that the money had been so credited and gave him a statement of the entire money collected. Dr. Larson then entered in a book of the common school district a record of the moneys as money so received. This was the first entry he ever made of the receipt of money as school treasurer. After the bank failed it was discovered that none of the money when collected had been credited on the bank books directly to the account of the common school district. Certain items which were the proceeds of insurance collections, amounting to $42,361.62, received by the bank on and between July 16 and July 24, 1923, were temporarily credited to the account of the high school district on the bank books. The proceeds of most of the balance of the money was credited to a town order account. On July 21, 1923, there was charged to the high school account and credited to the town order account $40,000. The town order account was used in the juggling process. Anything that got into that account seems to have lost its identity. The expert accountants who testified for the defense in

section (3) of section 59.22 the duties mentioned in any such oath or bond include, further, the faithful performance by all persons appointed or employed by such officer either in his principal or his said subsidiary office, of their respective duties and trusts therein."

Sub. (5), sec. 19.01, provides:

"Every public officer required to file an official oath or an official bond shall file the same before entering upon the duties of his office; and when both are required, both shall be filed at the same time."

Sub. (6), sec. 19.01, provides:

"Every such bond continues in force and is applicable to official conduct during the incumbency of the officer filing

reference to this account were not able to unravel it. None of the insurance money is shown to have been used for the benefit of the high school district. The evidence indicates quite clearly that none of it was so used. When the bank failed, the balance due the high school district, as shown on the bank book, was $1,171. This is the exact amount that the records of the high school district show that was so on deposit, although the high school district never claimed nor charged to the bank any of the insurance money now in question. On November 19, 1923, the bank credited to the account of the common school district an item of $38,409.97. On the same day there was entered on the bank book, as bills receivable, nine promissory notes aggregating this amount. These notes were found among the assets of the bank. Some of them had been rediscounted. None of the purported makers were ever found. The notes were all fictitious and worthless. The evidence indicates they were all signed in the handwriting of Henry E. Rohlf. This credit was undoubtedly made on the theory that it was the balance due the district for insurance money and other money received by the bank. If the bank owed the district this money, the credit was a proper one. A credit based on a valid indebtedness cannot be invalidated by other unlawful entries made by the debtor to balance other book accounts or to cover up other irregularities. The notes were not sold by the district to the bank, and they are in no lawful sense the basis of credit.

"Each school district owned a portion of the contents of the old building, on which contents insurance had been collected amounting to $9,333.45. On September 8, 1923, this matter was adjusted by the common school district paying the high school district $6,222.30. A school order was drawn for this amount and paid through the bank to the high school district.

"After the annual meeting of the common school district on July 2, 1923, the school board proceeded to use the insurance money to erect a new school building on the site of the old building, as directed by the electors. They had no other funds with which to pay

the same and until his successor is duly qualified and installed."

In addition to the specific statutory duties of the treasurer, it is the common-law and universal understanding that municipal treasurers are custodians of the treasures or funds of their municipalities. Larson was not only custodian for the district of funds raised by taxes, but he was the custodian of insurance or other funds belonging to the district. If a district should have its property insured, in case of loss it clearly would be the duty of the school board to collect the insurance, and the duty of the treasurer to accept and safely keep such funds. And certainly, when the treasurer accepts

for the building. On August 18, 1923, they let a contract for building the basement and concrete work for $2,958. On September 10, 1923, they let a contract for the main portion of the building for $45,284. School orders were drawn from time to time by the common school board to pay for this new building, which orders were paid by the bank up to the time when it suspended business, with the understanding on the part of all parties concerned that the orders were being paid out of money collected for insurance. When the bank failed there were unpaid outstanding orders amounting to $19,171.52.

"After the insurance money had been collected neither the high school district, its school board, its treasurer, nor any one else in its behalf ever claimed that the high school district then owned or was entitled to any of the insurance money except the portion that it received from the common school district. The defendants are now making such claim in their own behalf.

"The insurance should have been taken out in the names of both school districts. The school boards and the insurance agents had knowledge of the facts. It is not now necessary to determine if the contracts of insurance could have been reformed on the ground of mutual mistake, whether the insurance companies were estopped from questioning the validity of the policies on account of the title of the insured, whether they had any valid defense to the insurance claims, or whether the contract of sale of the high school interest in the building could have been enforced prior to the fire. After the fire the insurance claims were treated as representing the building. What was done amounted to an assignment of the insurance claims. The common school district paid $29,222.30 for these claims, of which amount $20,000 was paid before the insurance was collected. If Dr. Larson and the persons he permitted to handle the money of the district had performed their duties, the district would have made a profit on the transaction, although the district ran the risk of losing the $20,000 when it paid it. The districts, by the vote of their electors and officers, severed their joint rela-

such funds through an agent, he has the same responsibility therefor as though he personally had the funds in hand. All the parties to the situation treated the insurance funds to the extent herein involved as the funds of the plaintiff. The bank paid out, on the orders of the district, the greater part of such funds; it plainly recognized such funds as the property of the district; the high school district so recognized the funds as belonging to the plaintiff; it accepted its proper proportion of insurance on the school furnishings, and surrendered any claim on the balance to the plaintiff district. The amount of the funds in bank so claimed as belonging to the district, as found by the court, was stipulated by the par-

---

tionship in the school building and each erected a new school building. As between them the money and property changed hands according to their agreement and to their satisfaction. There were, or may have been, some technical irregularities in the procedure of the high school district which might or might not be cleared up if the proper records had been preserved of their proceedings. However, that district has kept the benefit it received in the trade and is not here complaining. Dr. Larson, as school treasurer, had the same possession, use, and control of the insurance money that he had of any other money of the district. When the electors voted to use this insurance money to build a schoolhouse, when contracts were made to do so by the vote of the school board, including Dr. Larson and Ernest E. Rohlf, with the assurance of the bank that the money was held for that purpose, when it was being so used without objection from any one concerned, and when the title, possession, and control of the school treasurer therein had been recognized by the bank the same as was done with other school money, then the fund was set apart specially for that purpose.

" 'Special municipal funds, which are dedicated by express statutory provision or by the act of a municipal council or board, duly authorized, to a special object, may not be diverted directly or indirectly to any other purposes.' 28 Cyc. 1563.

"This money was in legal effect money received by the school treasurer by virtue of his office and was in his possession. The possession of the persons with whom he had intrusted it was his possession.

"It is argued by defendants' counsel that neither the bank nor Ernest E. Rohlf were agents of Dr. Larson as treasurer and that he could not legally appoint them as such agents to take charge of this money. The fact is that they acted as his agents with his consent in the care of this money and of all other school funds. They were either his lawful agents or his unlawful agents. In either event, the treasurer, by the terms of the statute, was liable on his

ties. Larson recognized such funds as belonging to the district when he filed a claim therefor against the receiver in behalf of the district, and accepted from the receiver the *pro rata* share on such claim. He admitted the fact when he agreed to the report of the clerk in 1924. His testimony in court confirms the fact. Such being the facts, what was Larson's duty? It was to safely keep the fund for the plaintiff district. If he left the money in the bank, that fact did not change his responsibility.

The defendant surety company was a paid surety, pre-

official bond for the performance of their duties as 'persons appointed or employed by such officer.' Sec. 19.01 (3), Wisconsin Statutes.

"It is also argued that if Ernest E. Rohlf was the agent for treasurer Larson, he was also agent for treasurer Peterson, the treasurer of the high school district, and that it was his duty to keep the money for treasurer Peterson. If the high school district or its treasurer was now claiming this money or ever had claimed it, or if Rohlf or the bank was holding it for them or had ever expended it as agent for them, then the proposition would be more important.

"The situation is analogous to the case of a tenant who attorns to a new owner by consent of his landlord. Sec. 234.02, Wisconsin Statutes.

"Before such attornment he is estopped from denying the title of his landlord. *Winterfield v. Stauss*, 24 Wis. 394, 404.

"By such attornment the new owner becomes his landlord and he is likewise estopped from questioning his title. 35 Corp. Jur. 965, 967.

"The situation is also analogous to the case of a bailee who is defending his possession by asserting title in a third person. In order to maintain such defense he must defend by authority of such third person. 6 Corp. Jur. 1110.

"Persons dealing with municipal corporations are usually estopped from questioning the authority of such corporations in reference to contracts and transactions to which such persons become parties. 21 Corp. Jur. 1215.

"After the electors and school board had appropriated this money for the purpose of erecting a schoolhouse and made contracts and expenditures in pursuance thereof, all of which was done by and with the active participation and consent of the school treasurer and of the bank where the money was deposited, and without objection from any one else concerned, then the treasurer became estopped from denying that this money was the money of the district and in his custody as its treasurer. *School District v. Edwards*, 46 Wis. 150, 49 N. W. 968.

sumably paid from the funds of the school district. Such sureties are held to a reasonably 'strict performance of the conditions of their bond.

We may start with the premise that Larson, as treasurer, was required to perform his official obligations, and that his surety was bound equally with him to see that Larson actually conformed to such official duties.

The appellants strenuously contend that the insurance fund was lost before the bond was delivered, and that the bond was not retroactive to cover the whole term. In considering this we must construe the statutes heretofore quoted, with reference to the treasurer's bond and oath, fixing the duties of the treasurer and form of the bond.

To begin with, the bond recites that Larson "has been elected for a term of three years commencing on the third day of July, 1922," and then Larson and his surety undertook that Larson "will faithfully discharge the duties of his said office according to law, and will pay to the parties en-

---

*"The time covered by the bond.*

"A bond given by a surety to secure the faithful performance of the duties of his principal becomes effective at the time of its delivery. There are numerous authorities to the effect that unless it is retroactive by its terms or made so by statute, it does not cover prior defalcations. Note 23 L. R. A. N. s. 131.

"In other cases the rule is stated that a bond given to secure the faithful performance of the duties of a public officer who has been elected or appointed for a definite term is construed as covering defalcations occurring during the term for which the bond was given. *Vivian v. Otis,* 24 Wis. 518, 520; *Board of Supervisors v. Pabst,* 70 Wis. 352, 367, 35 N. W. 337.

"Several other authorities to the same effect are cited in the brief of plaintiff's counsel.

"This bond was given under sec. 19.01 of the Statutes. The last sentence of sub. (2) implies that the bond is for the 'official term.' Sub. (6) of that section provides, 'Every such bond continues in force and is applicable to official conduct during the incumbency of the officer filing the same and until his successor is duly qualified and installed.' The words 'is applicable to official conduct during the incumbency of the officer' undoubtedly refers to official conduct during the term of the officer. The statute provides that the bond shall be given before the officer enters on the duties of his office. Sec. 19.01 (5), Wisconsin Statutes.

titled to receive the same such damages as may be suffered by them in consequence of his failure so to discharge such duties."

We think the bond, by express language, fairly contemplates that it covers the full term of the treasurer, of three years commencing July 3, 1922. Further, the trial court found that the amount covered by the judgment remained on deposit in the bank until the bank failed, March 7, 1924.

This court, since the decision of the instant case in the circuit court, has tried to make plain the duties and responsibilities of custodians of public funds. *Forest County v. Poppy,* 193 Wis. 274, 213 N. W. 676. What was there said need not be here repeated. It should be unnecessary to again point out the absolute duties devolved upon such custodians of public funds, and that failure to safely perform such duties is not excused even by a showing of due diligence on the part of the treasurer. Legally, it makes no difference as to the liability of the treasurer and his bondsmen whether the

"A bond given after that time, nevertheless, is a valid bond and binding on the sureties. *Knox v. Fidelity & Casualty Co.* 184 Wis. 104, 109, 197 N. W. 733.

"It cannot be presumed that it was the intention of the statute, nor the intention of the parties giving the bond, that a bond given and accepted in statutory form was intended to cover only a portion of the obligations that the statute required, or that the parties giving the bond could take advantage of their own delay, which delay the district had waived by accepting the bond after such delay. The careful wording of the statute indicates that the legislature did not intend that loopholes of this kind were left open for the loss of public money.

"Besides, in this case a breach in the conditions of the bond occurred after the date of its delivery. Every day between November 7, 1923, the time the bond was given, and March 7, 1924, the time the bank closed, there was a continuing breach. If, when the bond was given, the school treasurer had promptly proceeded to withdraw the money from the bank and care for it as the law required, the loss probably would not have occurred. The burden of proof is upon the defendants to show that the loss occurred before the time covered by the bond. The evidence is not sufficient to sustain the contention that the loss occurred before the time when the bond was given. I am therefore of the opinion that the plaintiff is entitled to judgment as demanded in its complaint, less the amount of the dividend collected."

treasurer is honest or dishonest, careful or reckless, in the care of the funds committed to his charge. The law prescribes his duties, and he and his sureties are liable for their due performance.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied, with $25 costs, on June 18, 1928.